JAMES F. BOID, receiver &c.,

v.

DAVID M. DEAN and SARAH P., his wife.

1. A receiver appointed upon supplemental proceedings upon execution has by virtue of such appointment no interest in real estate held in trust for the judgment debtor.

2. A transfer of property made without consideration, and for the purpose of enabling the transferrer thereafter to commit a tort with impunity, is fraudulent and void as against a creditor by judgment founded on a tort so committed.

Final hearing on bill, answer and proofs.

*Mr. John H. Dahlke* and *Mr. Joseph M. Roseberry*, for the complainant.

*Mr. William H. Morrow* and *Mr. Jehiel G. Shipman*, for the defendants.

PITNEY, V. C.

The complainant was appointed by the judge of the circuit court of the county of Warren receiver of the property of the defendant David M. Dean, under the twenty-sixth section of the act respecting executions. *Rev. p. 394.* The judgment upon which the execution issued which gave rise to the proceeding resulting in the appointment, was recovered by William M. Gibbs against David M. Dean, January 9th, 1890, for $500 of damages and $103.76 of costs, in an action for slander.

On the 5th of February, 1889, eleven months prior to the recovery of this judgment, Dean conveyed to his wife, through a third party, a house and lot worth about $1,000, and also assigned to her his one-sixth interest, amounting to $500, in a bond and mortgage given to secure $3,000, the interest to be paid to Dean's mother during his lifetime, and at her death the principal to be divided between him and his brothers and sisters. Either on or

shortly before the 1st day of April, 1889, he gave and delivered to his wife all his money and personal property of every kind of which he was possessed; so that she thereby became vested with all his property.

Gibbs and Dean were partners in a small country store for one year, commencing April 1st, 1888, and on April 1st, 1889, the partnership was closed, the debts of the concern paid, and the assets divided and distributed in specie between the parties. The business of keeping the store was continued by Gibbs. Shortly afterwards Dean began to slander Gibbs, and, in so doing, used language which tended directly to injure his character and standing as a merchant, and in October, 1889, Gibbs brought the suit in question.

The allegation of the bill is, that these transfers to the wife were made for the purpose of defrauding the then existing and possible future creditors of Dean, and also to enable him to gratify with impunity a desire which he then entertained of injuring Gibbs's future credit and standing as a merchant; and it prays that the conveyance of the house and lot and the assignment and transfer of the personalty may be decreed to be void, and that the wife may be decreed to re-transfer the personalty to the receiver, and to account for the proceeds of so much of it as she may have turned into money, and to assign to the complainant any securities she may have arising therefrom.

The defendants take the point *in limine,* that this complainant has, and can have, no interest in the realty, and that as to that the bill must be dismissed. This part of the case is covered precisely by *Higgins* v. *Gillesheimer, 11 C. E. Gr. 308,* which was a bill by a receiver, appointed, as here, upon supplemental proceedings to set aside a conveyance of real estate only. The authority of that case was partially drawn in question in the court of errors and appeals in *Miller* v. *Mackenzie, 2 Stew. Eq. 291,* and it was there overruled in so far as it decided, or was supposed to decide, that a bill like that before the court could not be sustained for the purpose of reaching chattel interests. But *Miller* v. *Mackenzie* went no further. The chief-justice (at *p. 293*) expressly limits his reasoning and decision to personalty, when he says:

"With regard to the personal property of the debtor, *and it alone is here in question,* it seems to me plain that one of these receivers, by the act of appointing him, becomes vested with the title." I remark here that the act, as I read it, does not provide for any formal conveyance to the receiver of land or interest in it, and if it could be construed as authorizing such conveyance, none has been made in this case, and I do not think it according to the genius of our system of laws to hold that title to land can pass by a mere appointment to office by a court, and without any formal transfer of the title to be entered upon the record, and form a link in its chain. Following, therefore, *Higgins* v. *Gillesheimer,* as I did in *Skinner* v. *Terhune, 18 Stew. Eq. 565* (at *p. 571*), I shall decline to consider the case made by the bill and proofs as to the real estate, and confine myself to the chattel interests alone.

The case as made is as follows: Dean and Gibbs lived for many years in the village of Townsbury, Warren county, on the line of the Lehigh and Hudson Railroad Company. On April 1st, 1888, they entered into partnership to keep, for one year, a country store in a store-room which they rented of one Vliet, who appears to have controlled, and to have been able, so to speak, to rent as an appurtenant with his store-room the postmastership and station agency of the railroad. Dean held both these positions, but was under obligation to resign both at the end of his term. The capital invested in the business was $1,440, of which Dean contributed $1,080, or three-quarters, and Gibbs $360, and the term was one year. They purchased an old stock of goods belonging to former tenants and appear to have paid too much for it, and that circumstance probably aided in promoting the difficulty which subsequently arose between them. On or about January 1st, 1889, Gibbs succeeded in procuring for himself alone the lease of the store-house for the ensuing year, and with it the right to Dean's resignation and his own appointment as postmaster and station agent. This made Dean very angry. He forbade Gibbs to buy any more goods on the credit of the firm, and, on Gibbs's assertion of his right to do so, he wrote, January 4th, to the dealers from whom the firm

had made purchases warning them not to sell the firm goods on Gibbs's order. About the same time he went to the bank in Belvidere where the firm deposited their money, and directed the cashier to pay no checks of the firm not signed by both partners. He then, within a few days, drew several small checks against funds in the bank, signed in the partnership name by himself alone, in favor of creditors of the firm, in payment of goods previously bought, and sent them to the creditors, with the result that the checks were protested. This led to further disputes and wrangles. Finally Dean acquiesced in the purchase of sufficient goods to keep the business going until April 1st. This was done. Purchases and sales were made, mostly for cash, all debts were paid, and at the end of the month of March an inventory and appraisement of the goods remaining on hand was made, and they, and the accounts owing the firm, were divided in specie between the partners in the proportion of their several shares in the capital. Dean took his goods to his house and made a present of them to his wife, and subsequently purchased other goods, from time to time, and retailed them out from his house. In the meantime, on February 5th, and after the incident of the protested checks, and the wrangle which followed it, he made the conveyance and assignment of the mortgage complained of in the bill. Immediately after doing so he wrote a second batch of letters to all the dealers from whom the firm had purchased goods, to inform them that he had put his property in his wife's name; that all debts contracted up to that time by the firm would be paid, but that they must not sell the firm any more goods. Soon after April 1st he began to slander Gibbs, and did so continuously until suit brought, in October.

So far, there is little dispute between the parties. The differences arise when we inquire into the motives and object of Dean in this conduct. He denies that he was influenced by anger at Gibbs for ousting him from the store and the offices he held with it, and says, in explanation of his conduct, that early in December he looked over the bills owing by the firm and found that it owed $580, and that he thought there were not goods enough in the store to pay the debt. He knew that Gibbs was a man of no

Boid v. Dean.

means, and that any loss in the business beyond the $360 contributed by Gibbs would fall on him (Dean), and he became alarmed at the situation, and he says that he at once forbade Gibbs to buy any more goods; that he (Gibbs) declared that he would order all he wanted. He, however, refrained from ordering any until the latter part of the month of December, when he (Gibbs) ordered two bills of $78 and $64 respectively, without consulting with Dean. Dean then went to Belvidere and consulted a justice of the peace, by whose advice he wrote the first batch of letters to the dealers from whom they purchased goods, and gave the notice to the cashier of the bank not to pay the checks unless signed by both partners; and he says that his subsequent conduct in making the conveyance and writing the second batch of letters, a month later, was the result of the same state of mind, and was advised by competent counsel, whom he about that time for the first consulted.

Gibbs denies Dean's statement as to the indebtedness in December, and the alarm felt by him at that time, and swears that the trouble began about January 1st, when Dean learned that he (Gibbs) had secured the lease of the store for the then ensuing year.

Dean's story as to the indebtedness in December is unsupported by any evidence, and is contradicted by the circumstances. The stock of goods and the trade were both extremely small, and I do not see how so large an indebtedness as $580 could have been incurred without the knowledge of Dean, who gave the business his constant attention, had an opportunity to open all letters received, and cared for all moneys, drew all checks and paid all bills. Then he admits that most, if not all, of these debts were paid off by February 1st. The checks of the firm were produced, and show no indications of any such indebtedness or payment as Dean swears to. It would seem to have been easily within his power to have produced the bills and shown to whom this comparatively large sum of money was owing, but he failed to do so. Nor does he show whence came the money to liquidate it, nor why the first notice to the creditors was not sent earlier than January 4th.

I feel constrained to disbelieve Dean's story about the discovery of the indebtedness in December, and his alarm at it, and to treat it as a pure fabrication on his part, and to credit Gibbs's story that the trouble arose out of the leasing of the store for the ensuing year. He says that he asked Dean, about January 1st, if he wanted to continue in business as partners for another year, and that he said no; that he (Dean) then told him he should rent the store himself on his own account if he could; that he saw Mr. Vliet, the owner, at once about it, and brought him into the store to see Dean, and that Vliet asked Dean if he wanted the store another year, and he said, "Not as partner with Gibbs;" whereupon Vliet turned to Gibbs and told him he could have it, and left; that Dean became angry and said to him, "You can't keep store; I will spend my time and money to ruin you;" that on or shortly after the 16th of January, notice of the protest of the checks of the firm came to Gibbs's knowledge, and he asked Dean for an explanation, and he swears that Dean declared that he meant to ruin Gibbs's credit; that Gibbs hadn't much means and could not, and should not, keep the store; to this Gibbs replied that if Dean undertook *that* he would sue him, and it was then suggested that one partner could not sue another while the partnership continued; whereupon Gibbs said that when the partnership was closed, if Dean continued to pursue him, he would sue him, to which Dean replied, "I will fix my property, and then you can sue"—using an indecent word.

This story is substantially corroborated by a witness, Kelsey, who was a by-stander, and who identifies it by the circumstance of the protested checks and the question as to whether one partner could sue another. Gibbs's and Kelsey's story of what occurred in January is denied by Dean, but I feel constrained to give it credence. It is in accord with what subsequently occurred. Dean went immediately to Belvidere, consulted counsel, and the result was the deed and assignment to his wife and the second batch of letters to the creditor-dealers with the firm. The transfer of property was made February 5th, and it was completed, so far as concerns the chattels, on April 1st.

Boid v. Dean.

About the time that the assets were divided, another wrangle took place in the presence of witnesses—two boys, named Kelsey and Morgan—who swear. that Dean then told Gibbs that he would ruin him. The change in the post-office was made in June. Dean resigned as postmaster and freight agent in obedience to a covenant contained in the lease from Vliet, and in that connection declared that Gibbs should not be postmaster or freight agent and should not keep store, and that he (Dean) had everything fixed to ruin him and drive him out of business.

Dean's explanation of his conduct, and his excuse for the transfer of his property, is that he was afraid Gibbs would buy a large quantity of goods, more than the firm needed, in order to keep up the stock until April 1st, on the firm's credit, and have them on hand at the close of the partnership, and compel Dean to sell them to him at a sacrifice. But I can find no evidence of any such design being entertained by Gibbs. He was undoubtedly entitled to buy, on partnership account and credit, from time to time, goods enough to keep up the stock and make the business fairly profitable to its close, and there is no evidence that he designed or attempted to do more.

Nor does the transfer of Dean's property to his wife, made in February, seem to me to be at all warranted or justified by the apprehension, if it had been well founded, that Gibbs would run the firm in debt to an improper extent. As to all creditor-dealers, to whom letters were written and notice given, the transfer was unnecessary, since the notice was sufficient of itself to effect the desired end, and as to all creditor-dealers to whom no notice was given, the transfer was, of course, and upon the plainest principles, absolutely void.

Dean admits, on the stand, that before the close of the partnership year he became satisfied that there were substantially no outstanding debts, and that all cause for the alarm he had felt the previous December had passed away, and yet he, at the last moment, gave his share in the partnership goods to his wife, and, on April 1st, invested $200 in cash in the promissory notes of one Ketcham, payable to his wife. He continued to do business by selling goods out of his house precisely as if he was the owner

of the property, purchased goods in his own name and added to the old stock of the firm which he had at his house, and he retailed them out himself. As clerk of the school district he claimed and received credit in his own name on the books for goods furnished the district out of his stock; he lived in the house with his wife, with all the *indicia* and benefits of ownership precisely as he had done before the transfer.

There was, at the hearing, no pretence of any valuable consideration paid on the part of the wife, although Dean had sworn on his examination, under supplemental proceedings upon the execution, that she had paid him $800 as a consideration for the land. Dean frankly stated, on the witness-stand, that the transfer to his wife was for a temporary purpose, and that he expected that she would retransfer the property to him after the partnership was closed, but had as yet not done so, and that the only inducement to let it remain longer was that his health was feeble and his chances of life not good, and, having no children, he felt that he wished his wife to have his property when he died, and so was willing to let it stand in its present condition.

Upon this state of facts the complainant puts his case on two grounds, both of which he contends are found in the case, and either of which he argues is sufficient to entitle him to relief.

*First.* Granting that the transfer was made for the purpose stated by the defendants, and for that purpose only, and that it was quite innocent and free from fraud, in law and fact, still it is plain, as to the personalty at least, that the wife holds it in trust for the husband, and that it is plainly within the letter and spirit of the act respecting executions under which complainant claims title.

The twenty-fourth section of the act (*Rev. p. 393*) provides that the petition of the execution creditor shall state "his belief that the judgment debtor has property or money, or things in action due to him, *or held in trust for him,* where the trust has been created by or the fund held in trust has proceeded from himself" &c., and by the twenty-sixth section the receiver becomes vested with all such property rights. Now, it seems to me, under the circumstances above set out, that the wife holds

this personalty in trust for the husband, and that the first point is well taken.

But the complainant goes further, and insists, in the *second* place, that the transfer in question was (1) fraudulent and void, from the defendants' standpoint, as to present and possible future creditors by contract; and, further (2), that the evidence warrants the belief that it was made with the object and purpose of enabling the defendant Dean to do with impunity just what he has done.

As I have already stated, this transfer was, on Dean's own show, fraudulent and void as against any of his future contract creditors of the class he then says he had in his mind, namely, creditors of the firm by contract entered into in good faith with Gibbs on behalf of the firm. There was no pretence that the partnership contract forbade or did not include the right to purchase goods for resale by the firm on the credit of the firm. The right of Gibbs to make such purchases was conceded. The notices to the creditors did not allege, and were not put on the ground, of want of power in Gibbs. Such being the case, Dean had no right, in law or in equity, to protect himself against the effects of contracts entered into in the ordinary course of business by Gibbs while the partnership existed, by putting his property beyond the reach of creditors who became such in that way. But the debt here in question is not one of that class, and I am not prepared, without further consideration, to hold that the transfer, though void for the reason just mentioned as against future creditors of the class mentioned, was for that reason void as against the judgment obtained afterward by Gibbs. I leave that question undecided.

But the aspect of the case just dealt with does show quite plainly that the transfer was not made by way of a family settlement, or for other proper and lawful purpose, and aids to establish the ground first taken, namely, a general trust for the assignor.

The last branch of the complainant's second point was fully discussed, and with much ability, on both sides, and I have felt it to be my duty to consider and decide it. My conclusion on a

full consideration of the evidence is, that it warrants the belief that the principal, if not the only, object and purpose of the transfer in question was to enable Dean to say and do with impunity whatever he might thereafter choose about Gibbs in order to embarrass him in his business enterprises.

I have already alluded to the evidence in support of this position. The principal points are the anger of Dean on learning, as he did about January 1st, 1889, that Gibbs had secured the lease of the store and its incidents for the ensuing year, and his threat then made to prevent him from keeping the store and to spend his time and money to ruin him; his letters of January 4th to the creditor-dealers with the firm, forbidding further sales except on orders signed by both partners, and announcing the approaching dissolution on April 1st; the notice to the bank cashier not to pay checks unless signed by both partners; his immediate issuing to several creditors checks signed by himself alone, and their protest in accordance with his orders; the quarrel with Gibbs over these protests, and the renewed threat by Dean to ruin Gibbs's credit and to prevent his keeping the store, and his avowal that such was his object in having the checks protested; the threat of Gibbs to sue him if he undertook to persecute him, and Dean's threat to fix his property so that Gibbs's suit would be fruitless; the conveyance of the house and lot and assignment of the bond and mortgage to his wife, on February 5th, and shortly after this quarrel; the second batch of letters, February 9th, to his creditor-dealers forbidding any further sale to the firm; and then, six weeks or more later, after all danger from partnership debts was passed, and he had had time to cool, and the assets were about to be divided, his further threat to ruin Gibbs, and then his present to his wife of his share of the store goods, together with the money he received from the sales, and his loaning the money on promissory notes taken in his wife's name, and saying to the borrower that he put it in his wife's name because " he was afraid of Gibbs."

Now, there was no contention or pretence that at that time (about April 1st, 1889) he was afraid that he might be held liable for any debts which Gibbs had contracted or might con-

tract as partner.    The worst results of the partnership enterprise
were known, and he could only fear Gibbs on account of what
he had already said or intended thereafter to say about him.
Then came the slanders charging him with dishonesty in his
business.    These circumstances lead me to the conclusion above
stated, and it remains to inquire and consider the effect upon the
transfer in question.

It is well settled, as I think, that if after a person has incurred
a liability for a tort, and before suit brought upon it he makes a
voluntary conveyance or settlement of his property, and judg-
ment afterwards goes against him for the tort, the conveyance is
void as against that judgment.    It was so laid down by Chan-
cellor Runyon in *Scott* v. *Hartman, 11 C. E. Gr. 90,* and reiter-
ated by Vice-Chancellor Van Fleet in *Post* v. *Stiger, 2 Stew. Eq.
558, 559;* and while in neither of those cases was the point
necessary for the decision, yet the cases cited in support of the
doctrine do fully support it, and it is somewhat remarkable that
among them *Jackson* v. *Myers, 18 Johns. 425,* and *Clapp* v.
*Leatherbee, 18 Pick. 138,* were cases where the tort was, as here,
a slander.    In addition to the two last-named cases are *Fox* v.
*Hill, 1 Conn. 295; Leukener* v. *Freeman, 1 Eq. Cas. Abr. 149,
Freem. Ch. 236* (a case of damages for crim. con.), and *Barling*
v. *Bishopp, 29 Beav. 417, 6 Jur. (N. S.) 813.*    The rule is so
stated in *Wait Fraud. Conv.* §§ *110, 123,* where many cases are
cited in its support from other states.    The principle which un-
derlies it is that there is no distinction in this respect between a
cause of action founded upon tort and one founded upon con-
tract.    Each are equally entitled to be protected against voluntary
transfers of property.

If this is so, then it seems plainly enough to follow that if a
transfer be made for the purpose of immunity against torts there-
after to be committed, it is open to the same objection as if made
to avoid paying future contractual obligations.    In fact, it seems
to me that the party who suffers from a tort stands on higher
ground in this respect than one who suffers from a broken con-
tract, and that the argument from the latter to the former is *a
fortiori,* since he who contracts with another does so voluntarily

and with opportunity to inquire and investigate into the responsibility and reliability of his debtor, while the sufferer from tort has no such opportunity to avoid injury. It would, I think, be a startling proposition to advance, that a man holding spite and enmity against his neighbor may place the title of all his property in his wife, where he can fully enjoy it, and then proceed with impunity to gratify his spite by slandering his neighbor. Nor do I think the argument at all weakened by the circumstance, if it exists, so much relied upon by defendants' counsel, that no case can be found where a conveyance has been declared void because made in anticipation of liability for torts thereafter to be committed. If that were true, it might be well said in answer that no case can be found the other way, and the absence of all authority be well accounted for by the rarity of the occurrence. But, in point of fact, the case before us is not bare of authority, as was pointed out by Hosmer, J., in *Fox* v. *Hill, 1 Conn. 303,* where he cites *2 Rol. Abr. 34,* as deciding that a feoffment to the son of the feoffer a few days precedent to the commission of treason to secure the land from forfeiture is of no avail; and in the case of *The State* v. *Barkholder, 30 W. Va. 593,* the supreme court of that state held that a conveyance made for the purpose of avoiding the payment of penalties to be recovered for illegal sales of liquors thereafter to be made was void.

Defendants' counsel placed reliance upon the recent case of *Ex parte Mercer, L. R. (17 Q. B. Div.) 290* (1886), as overruling, or at least very much modifying, the earlier English cases on this subject. There a man who was under contract to marry one woman intermarried with another, and, after suit brought by the first *fiancé* for breach of promise of marriage, came unexpectedly into possession of a small legacy, which he at once settled, in the ordinary way, upon his wife and children, if any there should be, with remainder to himself. Judgment went against him in the suit, and it was held that the settlement was valid as against the judgment. It was an admitted fact in the case that there was no actual fraud on the husband's part, and that the thought of a judgment against him in the suit was not in his mind when he made the settlement, and it was on that avowed ground that

Boid v. Dean.

it was upheld.   I think the case is not in accord with the well-settled rule in this state and country and, up to that time, in England, that settlements of this sort are absolutely void, quite irrespective of fraudulent intent, as against all present liabilities. Further, I think it is not difficult to read between the lines of the judgments of the learned judges in that case that the real reason acted upon was that the settlement was reasonable, and one which the husband ought to have made, and would have made, if he had known of the legacy, prior to and as a consideration for the marriage, in which case it would have been unassailable, and ought not now to fail simply because it was made a few weeks after the marriage, especially as the disappointed *fiancé* did not contract on the strength of the defendant being possessed of it.

The remaining point taken by the defendants is, that there is no proof that the wife participated in this unlawful design of her husband, but such non-participation can only save the conveyance or settlement when it is made for a valuable consideration.   Where, as here, there is no consideration, then the innocence of the assignee or grantee is immaterial, and will not avail to save the transaction.   *May Fraud. Conv. 45 ; Wait Fraud. Conv. §§ 200, 208 ; 1 Story Eq. Jur. § 35.*

The complainant is entitled to an assignment of the interest in the bond and mortgage, and a transfer of the Ketcham notes, and, if necessary, to an account of moneys received by the wife from the husband.